**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GREGORY SLATE,

          Plaintiff,

   vs.

AMERICAN BROADCASTING
COMPANIES, INC., ET AL.,

          Defendants.

Civil Action No. 09-1761 (BAH/DAR)

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**<u>MOTION TO DISMISS FOR BAD-FAITH CONDUCT OF LITIGATION</u>**

Nathan E. Siegel
Chad R. Bowman
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, N.W., Suite 800
Washington, D.C.  20036-5514
Telephone: (202) 508-1100
Facsimile: (202) 861-9888

*Counsel for Defendants*

Defendants American Broadcasting Companies, Inc., ABC News/Starwave Partners, and Disney/ABC International Television, Inc. (collectively, "Defendants" or "ABC") respectfully submit this Memorandum in support of their motion to dismiss.

## INTRODUCTION

If ever a case gave meaning to the term "a fraud on the court," it is this one.  Plaintiff Gregory Slate ("Slate") claims to be a "freelance journalist," but the only evidence of what he actually does is that he is a part-time law student, a landlord, and a veteran litigant who has systematically engaged in bad-faith litigation.  The evidentiary record in this case establishes not only that his claims against ABC are factually and legally unfounded, but also that in asserting such claims Slate has fabricated evidence; made numerous false statements under oath and to the Court; threatened and intimidated witnesses and abused process; attempted to fraudulently collect evidence; and generally abused the discovery process.  Dismissal is the only sanction that will end the continued bad-faith pursuit of this action.

It is well-settled that this Court has the inherent power to dismiss cases conducted in bad faith, and the record here presents a textbook example.  Because the facts speak for themselves, most of this Memorandum discusses the extensive record of litigation misconduct, followed by a brief argument setting forth the applicable law supporting the dismissal of this action.

## STATEMENT OF FACTS[1]

Slate has engaged in numerous forms of misconduct in this case.  The most important, though by no means the only ones, are set forth below.

---

[1] Defendants herein recite only facts relevant to this motion, and hereby incorporate by reference the Statement of Material Facts Not Genuinely in Dispute ("SOF"), Dkt. 93-1, submitted in support of their Motion for Summary Judgment.

I.       **SLATE FABRICATED PURPORTEDLY KEY "EVIDENCE"**

Slate had an extensive course of dealings with ABC over nearly two years before setting

this dispute in motion in March 2008, and was "Director" of the Police Complaint Center most

of that time.  Yet apart from a handful of receipts, for that entire time period Slate has produced

only in discovery a couple documents purporting to be communications with ABC News (and

virtually nothing with the "PCC" or Diop Kamau during 2006-2007).  Neither document dates

from the 2007 20/20 story at issue here case, but rather purport to be from the summer of 2006.

Both documents are obvious fabrications, created long after the fact for this case.

A.       <u>The Mendelsohn "Letter"</u>

On May 27, 2010, about eight months after this case was filed and a month after ABC

had produced all of its e-mails showing the real course of dealings between ABC and the PCC,

Slate's former counsel informally provided what they contended was a key document as part of

"a few new things that have popped up." Dkt. 29-11.[2]  This was a PDF copy of a purported letter

dated August 21, 2006 ("the Letter") written by Slate to Michael Mendelsohn, an ABC News

associate producer with whom Slate worked in Cincinnati in June 2006.  Slate later produced the

Letter himself in late January 2011.  Dkt. 39-12.  The Letter is demonstrably a fake.

The Letter attempts to re-write history by, as of 2006, disavowing any connection with

the PCC and establishing Slate as an "independent freelance journalist" whose copyrights even

then were being violated by ABC.  The letter further purports to state in 2006 to Mendelsohn,

who did not work on the 20/20 story here, all of the self-serving terms Slate wants to say existed

for the 2007 story a year later.  Thus, Slate supposedly wrote in August 2006 that any payment

for footage he "produced" can only be negotiated with and made directly to him, that "[i]n the

---

[2] Slate had first provided documents to his counsel that were purportedly responsive to
Defendants' discovery requests a few days earlier, on May 23, 2010.  Dkt. 25 at 3.

future" he wants to be personally compensated with "at least six figures if it [his videotape] is used in a national primetime broadcast" and receive "full credit" as a producer. *Id.* No such assertions appear in the scores of e-mails Slate actually exchanged with ABC and Kamau between April 2007 and March 2008.

      1.      <u>The Letter is an Obvious, Back-Dated Fabrication</u>

Slate testified that he sent the Letter on or about August 21, 2006. Dkt. 37-2 at 101:22-105:3 (Slate Dep.). Mendelsohn never received it, *see* Dkt. 93-6 at ¶ 11, and Slate has no proof that he ever mailed it. Dkt. 37-2 at 99:14-101:6 (Slate Dep.). Even on its face, the Letter appears highly suspect. As produced, the Letter is a darkened PDF (non-native) copy set against other sheets of paper. Slate testified that he no longer has any native electronic file for the original letter. *Id.* at 108:12-15; 109:20-110:17.

Even more telling, however, are the contents of the Letter. A comparison of various statements in the Letter to other record evidence establishes that it was not written in 2006:

- "[m]y understanding was that ABC and its affiliates were not interested in my footage" and "I was confused when WCPO proceeded to produce a story with my footage." Dkt. 39-12.

Actually, before the WCPO story aired Mendelsohn e-mailed Slate, "Don't know yet when Phil [the WCPO producer] is airing his piece, but I'm sure he'll tell us." Dkt. 93-7 at Ex. M5. After the WCPO story aired, Slate's actual reaction to Mendelsohn was, "How are things going? Did you get a chance to see the piece that WCPO did? It was pretty good." *Id.* at Ex. M6. Slate was also interviewed extensively on air in the story. Dkt. 93-3 at Ex. 1.

- "WCPO reported that I was the Director of the Police Complaint Center. Although I know Mr. Kamau, I am not his employee and I have recently developed concerns about being publicly associated with him and his organization." Dkt. 39-12.

Slate's claim that he wrote these words in August 2006 contradicts the entire course of his life over the next sixteen months.  As the summary judgment record demonstrates, Slate's split with the PCC and Kamau occurred in *December 2007*, almost a year and a half after the letter is dated.  *See, e.g.*, SOF ¶ 80-85.  In the intervening period, Slate did multiple television news stories as the "Director" of the Police Complaint Center, held himself out as the "Director" or "Executive Director" to ABC and other third parties , including specifically to WCPO, *id.* ¶¶ 3-4, 10-18, and worked hand-in-glove with Kamau both with ABC and numerous others – even calling Kamau 198 times over a few weeks in September 2007 alone, *id.* ¶ 42.  Tellingly, in a 2009 lawsuit against Kamau filed in D.C. Superior Court, Slate testified that his relationship with Kamau ended "around December 2007."  Dkt. 29-3 at 8:1-14.

- "I have paid my dues as a journalist and my recent success, including receiving an Emmy Award for Investigative Journalism, have substantially elevated the value of my work."  Dkt. 39-12 at 2.

This referred to a local, Chicago-area Emmy award (not the national Emmys), involving a story aired by local station WITI in Milwaukee.  Dkt. 37-2 at 172:8-10, 180:1-14 (Slate Dep.).  The problem with this assertion is simple:  Slate actually received this award in December 2006, four months *after* he claims that the Letter was written and sent.

The Emmy winners were first announced on *November 19, 2006*, three months post-dating the letter.  But even then, Slate was not among them.  That was because his name had never been entered as a contestant for this award by WITI, whose staff submitted the entry and won the award.  *See* Dkt. 93-27 Ex. S-10 at 14:8-27:22, 68:12-69:1 (Cowing Dep.); *id.* Exs. S-11, S-12, S-13 (Category 2-b, entry "Conduct Unbecoming"), S-19.  Slate only received this Emmy award in December 2006 because, ironically, after the award was announced his then-boss at the PCC (Kamau) lobbied WITI to have Slate added as a winner, because WITI had hired the PCC for story.  Dkt. 93-24 at 47:3-14 (Kamau Dep.), Dkt. 93-36 Ex. S-127**.**  The WITI

producer agreed to make that request to the regional organization that awards the Chicago-area

Emmys, and explained to the Emmys that Slate "is a co-founder of the Police Complaint Center

in Washington, D.C., a non-profit organization that has lended its expertise to news

organizations across the country."  Dkt. 93-27 Ex. S-10 at 27:24-31:12 (Cowing Dep.); *id.* Ex. S-

14; Dkt. 93-24 at 49:14-51:19 (Kamau Dep.), Dkt. 93-37 Ex. S-128.  The organization approved

the request on December 11, 2006, Dkt. 93-27 Ex. S-15, and the WITI producer then e-mailed

Kamau that "they approved Greg's addition to the winning entry," Dkt. 93-37 Ex. S-128.  Thus,

the Letter dated in August 2006 refers to something that happened months later.[3]

### 2.   Slate's Repeated Perjury to Try to Explain the Letter

It is obvious what happened here.  Since winning this award, Slate has for years grown

used to referring to himself formulaically as an "Emmy-award winning journalist."  *See, e.g*,

Dkt. 9-2 at ¶ 2; Dkt. 47 at 5; Dkt. 61-9 at M2U00003 at 5:30- 5:56.  When he crafted a back-

dated letter many years later, he simply forgot he had not yet won the award then.  Once he was

caught, in addition to the initial fabrication Slate has now repeatedly lied about the Letter

throughout the course of this case, with his explanations shifting over time as more information

came to light, causing to him to sink ever deeper into a perjury quagmire.

Slate's shifting efforts to reconcile the letter with the facts: When Slate was first asked at

his deposition if the Emmy had been awarded by August 21, 2006, his response was, "it appears

that it was awarded then" and "that I had received it then."  Dkt. 37-2 at 183:21-184:4 (Slate

Dep.).  Obviously, that was not so.

Quickly recognizing that answer might prove problematic, his response shifted to "I don't

recall when they told me that I had gotten it," *id.* at 184:13-15, which in turn shifted to implying

---

[3] Kamau's role in obtaining this award for Slate also underscores the falsity of Slate's claim that he wrote a letter in 2006 that disavowed any association with the PCC or Kamau.

that perhaps the letter's reference to "recent success, including receiving an Emmy Award" was actually not about *winning* an award, but about being *nominated* – saying "obviously the nominations precede the awards by some time." *Id.* at 185:1-3.  The problem with that turned out to be that (1) the nominations also post-dated the Letter, and (2) Slate was never nominated.

After his deposition, Slate pursued that explanation vigorously.  He did some research and discovered that the deadline for submitting entries that year was June 12, 2006.  *See* Declaration of Nathan Siegel in Support of Motion to Dismiss ("Siegel MTD Decl.") Ex. A.  In papers filed a few months after his deposition, Slate's story became that because the entry had been submitted in June 2006, "he was guaranteed an Emmy nomination award" by August, so his "use of Emmy award winning" in the letter was "the result of carelessly omitting the nomination qualifier." Dkt. 71 at 10.  Positing his own personal knowledge in the alternative, Slate alternatively suggested that the wording of his Letter was "the byproduct of confidence that he would win the award because of the pride that he took in his work." *Id.*

These explanations are incredulous on their face,  but in any event Defendants then deposed Rebekah Cowing, the executive director of the organization that presented these Emmys.  She revealed that Slate's name was never included in the entry submitted by WITI in June 2006; that nominations were first announced on September 26, 2006, a month after the Letter is dated; and that Slate was never nominated because his name was never entered. Dkt. 93-27 Ex. S-10 at 14:8-20:22, 68:12-69:1 (Cowing Dep.); *id.* Exs. S-11, S-12, S-19.  Plainly Slate did not, as he claimed to the Court, "careless[ly] omit the nomination qualifier" or have "confidence" that he was going to win an award for which he was never entered.

Slate's false testimony about being added to the award:  At his deposition, Slate adamantly denied that he was later added to the award.  *See generally* Dkt. 37-2 at 175:7-182:10

(Slate Dep.).  He swore that "I've never seen anything to that effect," *id.* at 180:18-19; testified

that he could not recall any of the e-mail correspondence regarding it, *id.* at 175:22-178:22; and

swore that the PCC never lobbied to have his name added, saying "frankly I'm grasping at who

one would ask to receive an Emmy award," *id.* at 175:12-21.  He also claimed that in the Emmy

organization's publications (which he printed from a website for this litigation) his name appears

no differently than any other recipient of an award.  *Id*. at 177:14-178:22; 180:15-182:10.

Cowing not only confirmed that Slate's name was added in December 2006, she

produced e-mails from the WITI producer Kamau had e-mailed, showing how that happened

(some of the same e-mails Kamau had earlier produced).  Dkt. 93-27 Ex. S-10 at 31:4-37:1

(Cowing Dep.); *id.* Exs. S-16, S-17, S-18; Dkt. 93-24 at 49:14-51:19 (Kamau Dep.); Dkt. 93-37

Ex. S-128.  Kamau also produced additional e-mails showing that he had forwarded to Slate his

correspondence about adding his name, Dkt. 93-24 at 47:3-14 (Kamau Dep.); Dkt. 93-36 Ex. S-

127, while Cowing produced e-mails directly with Slate from early January 2007 about his

ordering the award statute, following his being added to the award.  Dkt. 93-27 Ex. S-10 at 31:4-

37:1 (Cowing Dep.); *id.* Exs. S-16, S-17, S-18.  Cowing likewise testified and produced

documents showing that Slate's name did in fact appear differently on the organization's

documents – it was not on any of the organization's list of nominees and winners printed in

2006, and was only added later after he had won the award and the organization updated its list.

Dkt. 93-27 Ex. S-10 at 89:5-91:10 (Cowing Dep.); *id.* Ex. S-20 (Category 2-b, entry "Conduct

Unbecoming").  In short, the Letter "popped up" in May 2010 because Slate had fabricated it.

### B.      The KTVI Notes

Slate also produced a few pages of handwritten notes that purportedly were written in the

summer of 2006.  These notes, like the Letter, are intended to similarly re-write history.  For

example, notes with a caption, "Mike Mendelsohn." include annotations that read, "separate lic." and "6 figs for sweep or nat[ional]."  Dkt. 66-51.  Notes captioned "Silber 6/2/06" – presumably Glenn Silber, the ABC News producer who was Mendelsohn's boss on the Ohio project -- "Diop/PCC separate from me." *Id.*  Dkt. 66-52.  Slate testified that this page of notes was written as dated, on June 2, 2006.  Dkt. 37-2 at 68:22-70:5 (Slate Dep.).

As with the Letter, however, the dates of these notes do not add up.  The notes are written on stationery for KTVI, a local television station in St. Louis.  Working for the PCC, Slate did a story with that station that aired in mid-February 2007 – at least seven months *after* the notes were purportedly written – and which identified him as the "Director of the Police Complaint Center."  Dkt. 93-38 Ex. S-173.

When Defendants in motion practice pointed out the discrepancy between the supposedly June 2006 notes and the February 2007 air date, Slate's response was that "Plaintiff was in fact working for a Fox television station in 2006" because "footage is commonly shot months in advance of the date that the actual story is aired" and "because of the consistent, overwhelming success and resulting commercial value of Plaintiff's footage it was almost always held for broadcast until the next sweeps cycle . . . . and the Fox Television Station did in February 2007."  Dkt. 71 at 11.

This explanation flatly contradicted his sworn deposition testimony just a few months earlier, where he testified that he could not recall working for KTVI prior to February 2007.  Dkt. 37-2 at 88:4-6 (Slate Dep.).  It is also demonstrably false.  The broadcast itself reveals when the footage was shot, because it has dates and time codes throughout accurately showing that it was filmed on January 26-29, 2007 (which also shows Slate wearing a winter coat throughout the filming).  Dkt. 93-38 Ex. S-173 at 4:21, 4:41, 10:44.  For example:



*Id.* at 10:51; *see also* Dkt. 93-4 at ¶ 4.[4]   Indeed, the KTVI news director who had the idea for the

story first started working at KTVI after June 2006.  *Id.* at ¶ 3.

Likewise, Slate's explanation that the KTVI footage was recorded in the summer of 2006

but then held for the "next sweeps cycle" is wrong.  If the notes had been written on June 2,

2006, the "next sweeps cycle" would have been July 2006, the one after that November 2006,

while February 2007 would have been *three* sweeps cycles later.  Slate himself has filed motions

explaining "sweeps," even attaching an article entitled "How Does Sweeps Week Work," Dkt.

47-8 explaining in detail how they occur "4 times a year."  Dkt. 47 at 15-15; Dkt. 51 at 12.

That Slate fabricated these documents alone warrants this case's dismissal.  In addition,

the manner in which Slate produced these notes exemplifies his bad-faith conduct.  Slate

"produced" versions of these notes just days before his deposition, by hiding them in other

_____

[4] Slate did in fact make one prior trip to KTVI try to film this story – not "months in advance", but rather two weeks earlier, around January 12-13, 2007, which was unsuccessful because there was too much snow.  Dkt. 93-4 at ¶ 4.  Slate produced a few documents in response to other discovery requests that are consistent with these dates.  He produced a boarding pass showing the second leg of a flight to Baltimore on January 13, 2007, issued in St. Louis.  Siegel MTD Decl. Ex. B.  Slate also produced a rental car receipt from St. Louis that shows him renting a car from January 26-29, 2007.  *Id.* Ex. C.

voluminous, completely irrelevant documents.  In a series of e-mails, he produced in .PDF
format 19 separate variations of the same 274-page LEXIS-NEXIS printout of corporate
information for media companies, printed out on February 18, 2011, as well as a Ninth Circuit
opinion printed out from Findlaw.com.  Dkt. 29 at 14.  In four versions of the printouts, Slate
electronically inserted single, blown-up pages of these handwritten notes – once at page 6 of 11,
twice at page 72 of 74, and once at pages 27 and 52-53 of 54.  *See* Dkts. 66-53, 66-54, 66-55, 66-
56, and 66-57.  Copies of the notes hidden in these printouts had also been cropped to hide
everything revealing that they were written on KTVI stationery.  Dkt. 66-53 at 7; *see also, e.g.*,
*id.* Dkt. 66-54 at 73.  The only conceivable reason was to try to hide these documents, while later
being able to claim to have produced them.[5]

## II.    PERJURY AND FRAUDULENT REPRESENTATIONS TO THE COURT

Like these documents, much of Slate's testimony was fabricated and Slate's pleadings
and papers contain numerous false representations to the Court.  Slate's repeated claim that he
has no memory of most relevant events is not credible, and more specific claims he makes in
motion papers when he is not under oath are often demonstrably false.  Several illustrative
examples are set forth below.

### A.    The Letter and the Notes

As PART I makes clear, Slate's testimony about the Letter is perjurious, starting with the
basic claim that he wrote it in August in 2006 and mailed it to Mendelsohn, Dkt. 37-2 at 58:19-
61:21; 99:14-100:21; 103:22-104:17; 104:18-105:3 (Slate Dep.), to the claim that he cannot

---

[5] Notably, after ABC's counsel found the hidden, cropped notes before the deposition and
demanded the full pages, Slate appeared to back away from these documents.  At his deposition he
claimed that he could not testify about them because he cannot read his own handwriting (even though
they are plainly legible), could not recall talking to Silber at all, and that the notes relating to Mendelsohn
did not refresh his recollection about a conversation with him beyond recalling that he worked for John
Stossel. Dkt. 37-2 at 68:22-83:3 (Slate Dep.).  The notes are therefore plainly inadmissible, but that is no
justification for producing strategically hidden, fabricated documents in the first place.

recall anything about what computer he supposedly wrote the letter on, *id*. at 106:13-15, to most

of his testimony about the Emmy award referenced by the Letter, *id.* at 175:12-21-178:22,

183:22-185:3.  Slate has also made multiple false representations to the Court, such as claiming

not to have any original or electronic version of the letter because "the true 'original' of the letter

was the one which Plaintiff put in an envelope and sent to Mendelsohn in 2006 . . . .", Dkt. 71 at

11, and his "nomination qualifier" explanations, *id.* at 10.  The same is true with respect to his

testimony about when he wrote the notes and representations about the timing of the KTVI story.

Slate also further used the false assertion that he mailed the Letter to try to conduct baseless

discovery into ABC's mail receipt and distribution procedures, *see, e.g., id.* at 9, which is the

essence of bad-faith litigation conduct.

      **B.**      <u>**Slate's History with the PCC**</u>

      Slate testified that he cannot recall if he ever identified himself as working with the PCC,

that he never represented himself publicly as affiliated with the PCC after August 2006, that he

cannot recall if ever sent correspondence on behalf of the PCC but "can't be certain" that he did

not, cannot recall being the PCC Director, cannot recall Kamau being associated with any

organization other than ABC News, has no knowledge about what if any role the PCC played in

television stories he did, and that the only people he can recall using the term "Police Complaint

Center" are Defendant's counsel Chad Bowman, some people at ABC News, and Greg Miller in

late 2010 (an incident discussed *infra*).  Dkt. 37-2 at 39:11-44:1, 84:1-86:1; 87:20-88:3, 97:6-12,

115:11-14, 173:21-175:6 (Slate Dep.).  In interrogatory responses Slate would only acknowledge

that "*during early 2004 and 2005* Plaintiff worked as an independent contractor with various

individuals and entities who Defendants define as being part of the PCC," Dkt. 93-23 Ex. S-1

(Resp. to Int. No. 5) (emphasis added), an answer he later tried to change to holding himself out

as a PCC "agent" but only during that time period.  *Id.* Ex. S-2 (Suppl. Resp. to Int. No. 5).  The

extensive record of Slate's role with the PCC supporting ABC's summary judgment motion, hereby incorporated by reference, leaves no room for doubt that this testimony is perjurious.

     **C.**     <u>**The UPS Mailbox**</u>

     Slate testified that he does not know what "1220 L Street, Suite 100-164" is, cannot recall if he ever knew, and cannot recall if he ever used it as his address or received mail there. Dkt. <u>37-2</u> at 34:9-13, 39:6-10, 95:17-22 (Slate Dep.). The summary judgment record, and even his own prior sworn testimony in another lawsuit, Dkt. <u>64-2</u> at 32:9-33:7, makes clear this testimony is knowingly false. In fact, the record shows that this mailbox was so important to Slate that even his parents' utility bills were sent there, *see* Siegel MTD Decl. Ex. D, and it was a significant point of dispute with the PCC as Slate exited there. *See generally* SOF ¶ 83. Slate even retained an attorney in 2008 to threaten the UPS store with litigation, who asserted to the store that:

> It is my understanding that this mailbox was originally opened in Mr. Slate's name for business mail and personal mail. However, Mr. Slate advised me that in November 2007 [*i.e.*, around the time Slate and the PCC parted ways], the wife of his *business partner* [*i.e.* Diop Kamau] called you requesting that you stop sending business mail to this mailbox. However, you complied with her wishes although the box has always been in Mr. Slate's name. Mr. Slate, at this point, does not have any problem with you sending the business mail to his former business partner . . .

Dkt. <u>70-1</u> (emphasis added). This letter stands in stark contrast to Slate's sworn testimony in this case, about both the UPS box and his relationship with Kamau.

     **D.**     <u>**The E-Mails**</u>

     When Slate's former counsel in May 2010 e-mailed the Letter, he also claimed that Slate had nothing to do with any of the e-mails ABC produced because "[h]e was in Chicago and all of his dealing with ABC and with PCC were via his university e-mail address. The Slate e-mail

address at PCC was received by Kamau at an address Slate never had access to."  Dkt. 29-11.

Slate's sworn testimony was more evasive, but is nonetheless indisputably perjurious:

> Q:      Did you use that e-mail address, gslate@policeabuse.org?
> A:      Not that I recall.
> Q:      Did you ever send e-mail from that address?
> A:      I don't recall at this time.
> Q:      Did you ever receive e-mail at that address?
> A:      Not that I recall.
> Q:      Okay. Is it your testimony today that you could have, but you don't remember; or that you did not send or receive e-mail from that address?
> A:      No.
> Q:      What is your testimony?
> A:      I don't understand. There's two – there was two questions in that.
> Q:      You said that you don't recall.  Is it possible you used that address?
> A:      I couldn't say with certainty.
> Q:      Why not?
> A:      Because I don't recall using it.

Dkt. 37-2 at 89:4-90:2 (Slate Dep.).  Similar testimony followed with respect to every specific e-

mail Slate was examined upon, with occasional insinuations, followed by immediate

qualification, that Kamau somehow impersonated him.  For example:

> Q:      I believe the question is do you think someone else sent this as Greg Slate? Do you have any reason to believe that?
> A:      Well, I contacted the FBI about identity theft by Diop Kamau, so --
> Q:      So you believe Diop Kamau was impersonating you?
> A:      I didn't say that.
> Q:      So then what's the answer to the question? Do you believe -- you believe someone was impersonating you?
> A:      I can't say with certainty right now.

*Id*. at 92:4-15; *see also id*. at 151:8-19.  In his briefing to the Court he has more forcefully

implied that he disputes authoring or receiving any gslate@policeabuse.org e-mails, as well as

the authenticity of all e-mails produced by Kamau.  *See, e.g.*, Dkt. 28 at 2 ("an email from an

address the authenticity of which they know are a serious issue of dispute in this litigation" . . .

"Mr. Kamau has a documented history of identity theft, forgery, and copyright infringement" and

"a tendency to impersona[te] others over email"); Dkt. 59-2 at 7 ("the origin and veracity of the

e-mails are highly disputed"). Similarly, at the deposition of Kamau, Slate objected to e-mails produced by Kamau on the grounds that they were supposedly "fabricated." *See, e.g.,* Dkt. 93-24 at 47:7-13 (Kamau Dep.). Slate also used these claims as a supposed basis to seek irrelevant discovery into ABC's e-mail system, yet another exercise in bad faith. Dkt. 59-2 at 7.

The record, and common sense, demonstrates that any suggestion that these e-mails are fabricated or that someone was impersonating him for years (and stopped just when he left the PCC) is patently absurd. There are also numerous objective indicia of their authenticity:

1.  Slate's e-mails consistently correspond with his actions.

For example, one lengthy e-mail from Slate to Kamau began: "On September 5 . . . At approximately 4 p.m. I arrived in Klamath Falls to perform final work for a client . . . . after finishing dinner I began my trip to Eugene to make my morning flight to Jacksonville." Dkt. 93-38 Ex. S-154.[6] In fact ABC paid to fly Slate from Chicago to Oregon, Dkt. 93-18 Ex. C3 at 2761, his cell records show four roaming calls from Klamath Falls, Oregon on September 5 beginning at 6:18 p.m., Dkt. 93-37 Ex. S-129**,** and his credit card records show a flight from Eugene to Jacksonville on September 6, Siegel MTD Decl. Ex. G. Similarly, Slate's e-mails to Ruppel from Chicago describe the video he was contemporaneously recording for ABC. *See, e.g.*, Dkt. 93-10 Ex. R20 ("The Mette fundraiser is stocked with Miller Light and Vodka. We are here now"; "I'm on email all night."); Siegel MTD Decl. Ex. H. Slate also stayed in the hotels for which ABC e-mailed him reservations. *See, e.g.*, Dkt. 93-9 Ex. R5 at ABC00236-37 (e-mail to Slate showing a reservation for a Fairfield Inn beginning August 13); Dkt. 93-39 Ex. S-179

---

[6] Slate in the same email told Kamau that he "researched [a] hidden camera deck and pen camera and ordered both on my brothers American express." Dkt. 93-38 Ex. S-154. Slate and his brother's credit card records show this purchase on September 5, 2007, a $941 charge to SSI Inc. (which is hidden camera retailer Spy Source, Inc.) from Jonathan Johnson's American Express account, who is his brother. Siegel MTD Decl. Ex. E. The retailer's shipping receipt likewise shows the September 5, 2007 purchase of digital video recorder with PEN camera, for $941 paid by American Express, to be shipped to Greg Slate for pickup in Florida. *Id.* Ex. F**.**

(Fairfield Inn receipt beginning August 13 showing "Gregory Slate, ABC News" with payment by ABC's credit card).

> 2.   Non-party witnesses produced e-mails to and from Slate at gslate@policeabuse.org.

Cowing produced e-mails to and from Slate at gslate@policeabuse.org concerning ordering his Emmy statute.  Dkt. 93-27 Ex. S-10 at 31:14-37:1 (Cowing Dep.); *id.* Exs. S-16, S-17, S-18. Briana Heard, a photographer whom Slate asked to come to Chicago, produced multiple e-mails to and from gslate@policeabuse.org.  Dkt. 93-26 Ex. S-8 at 7:2-8:3, 12:13- 14:7 (Heard Dep.); *id.* Ex. S-9; *see also* Dkt. 93-39 Ex. S-180.  One is dated September 28, when Slate was in Chicago for this matter and it says "Oh Briana, I've had such a long day in Chicago."  *Id.* at BH 14.

> 3.   Slate's e-mails from his personal University of Maryland address, which he does not contest using, refer to his PCC account and Slate used the accounts interchangeably.

On September 28 Slate e-mailed Ruppel from his umd.edu address, saying "My e-mail has been acting up lately.  Please cc my e-mails to this address as well."  Dkt. 93-10 Ex. R18. Ruppel responded *only* to the umd.edu address, but Slate responded back – twice that evening – from his PCC e-mail account.  *Id.* Exs. R19, R21.

Earlier that day, Slate had also e-mailed Kamau from his Maryland account, complaining "our e-mail is down."  Dkt. 93-38 Ex. S-146.  A couple of days later Slate again e-mailed Kamau from his umd.edu address: "I have been using our web based policeabuse email account to store many files and old emails.  Now I can no longer access it.  Can you send Tek [the PCC webmaster] an email and figure out what is going on.  We need to access that information."  Dkt. 93-24 at 107:5-110:24 (Kamau Dep.); Dkt. 93-37 Ex. S-131. Similarly, after he left the PCC Slate e-mailed Sunny Antrim from his "umd.edu" address, saying "My email address and

telephone number has *changed* and I didn't get your messages."  Dkt. 93-13 Ex. R89 (emphasis added).

> 4. Some of Slate's PCC e-mails were sent  from the same computer as his personal University of Maryland address.

Internet header data demonstrates that six of the gslate@policeabuse.org e-mails to Ruppel were sent from the same IP address – and likely the same computer – in the Washington, D.C. area as six of the gslate@umd.edu e-mails to Ruppel – which Slate admits he sent.  *See* Siegel MTD Decl. at ¶¶ 10-21; *id.* Ex. I.  The dates of all of those e-mails are dates when Slate was not in Chicago.  Plainly, Slate in Washington, D.C. sent all those e-mails from the same computer.  Thus, the objective evidence merely confirms what common sense makes obvious – no one "impersonated" Slate or fabricated these e-mails going back years.

### E.  The Recording and Disposition of Footage

Slate testified that he does not know what Jack Baird or Mark O'Flahavan were doing in Chicago and never saw them record any footage.  Dkt. 37-2 at 159:9-160:14, 205:3-206:8 (Slate Dep.).  This again is obviously not so.  The record shows that Slate spent *two weeks* in Chicago working and living in the same hotel with them, and arranged Baird's travel with ABC.  Slate even obtained PCC releases from them.  SOF ¶¶ 29-30, 35-36.

Similarly, Slate claimed not to recall using any camera equipment in Chicago that did not belong to him.  Dkt. 37-2 at 208:12-21 (Slate Dep.).  In fact, he recorded multiple tapes using ABC-provided camera equipment, and there is video footage of his shirt button being outfitted with an ABC-provided "button camera" in a hotel room.  SOF ¶¶ 53-54.  Even more absurd is his testimony that in 2006 he only recalls "showing" Mendelsohn footage, but that he cannot be certain whether "the footage left my hard drive and was somehow saved onto the ABC employee's hard drive" in "the process of the showing."  Dkt. 37-2 at 56:9-21 (Slate Dep.).

### F.     ABC's Payment of Slate's Expenses

Slate has steadfastly refused to acknowledge that ABC ever paid any travel expenses for

him, and repeatedly insinuated that he had paid his own, though he "couldn't say for certain."

Dkt. 37-2 at 66:16-66:17; 154:14-157:11 (Slate Dep.).  In reality, the evidence shows that he

well knows he did not spend the more than $10,000 that these trips cost.  SOF ¶¶ 31, 46-47, 61.

Similarly, when asked in an interrogatory to list all expenses paid by ABC for any "airfare, rental

car agreements, accommodations," Slate stated that he was reimbursed for approximately $1,400

in expenses, Dkt. 93-23 at 11 – once again highly misleading.  He took three round trip plane

flights within a period of two months, spent three weeks in hotels and rented three cars, after

exchanging numerous e-mails with ABC personnel about his travel arrangements for each trip.

SOF ¶¶ 28-37, 41-51.

### G.     Recording His Own Deposition

Slate lied to both counsel for ABC and the Court about recording his own deposition.

Just after a status conference, on the way from the courthouse to his deposition Slate faxed a

letter to Defendant's counsel stating "per our conversation I will create my own recording of

today's deposition."  Dkt. 37-2 at 9:3-12:6 (Slate Dep.); Siegel MTD Decl. Ex. CC.  There was

no such prior conversation.  Dkt. 37-2 at 13:20-14:12.  Slate reiterated this false claim of a prior

"conversation" directly to the Court during the deposition:  "I told them before that I intended to

record my own deposition, and that's what I'm doing."  *Id.* at 135:18-22.

### H.     The Second Amended Complaint

The Second Amended Complaint is a fiction.  It alleges that Slate pitched the idea for this

story to Mendelsohn on 2006, that Ruppel "shortly thereafter" contacted Slate and agreed to pay

Slate's expenses but understood that Slate would expect "six figure compensation" for any

footage, that Slate then went to Chicago several times with occasional assistance from "three

other employees," and that the footage was then "made available to ABC," who proceeded to use it without permission.  *See generally* Dkt. 88.  The Complaint never mentions the PCC, nor Kamau, nor that Slate physically worked with multiple ABC News personnel and with ABC equipment.  While Slate at his deposition could not recall what is alleged, that does not excuse the reality that the Second Amended Complaint recounts a wholly fabricated story.

**I.      Defrauding Other Courts**

Slate's zeal to pursue his fictional claims has spilled over into multiple courts in this jurisdiction, replete with similar acts of perjury and misrepresentation as exhibited here – as well as other misconduct discussed elsewhere in this Memorandum.  For example, in suing Kamau personally, Slate told the same false tale to the D.C. Superior Court that he pled here.  Slate testified:  "The basis for that [the ABC lawsuit] was I was working with ABC News and had, produced a substantial amount of copyrighted material.  And Mr. Kamau was apparently also connected to the project and he took my material and sold it to ABC . . . ." Dkt. 29-3 at 4 (7:5-9).  Slate also claimed that he is a licensed private investigator and that his relationship with Kamau was limited to that role:  "[A]t times he would contract with me as a private investigator to go to a particular place and, and do a job that he had been contracted to do."  *Id.* at 3 (8:9-25).  These false statements were plainly designed to mislead the D.C. Superior Court in order to be consistent with the Complaint he had filed in this Court two days later.

**J.      The U.S. Copyright Office – and this Court**

As Defendants' Motion for Summary Judgment sets forth, Slate's premise that there is some unique and valuable "Chicago Footage" that belongs to him wholly ignores the reality that similar "Chicago Footage" was filmed by more than a half-dozen persons working on this story.  Not surprisingly, Slate's copyright registrations, whether by mistake or design, contain some material recorded by other people, so it cannot purportedly be his.  For example, the movie file

"Dg899" contained on Disc 1 of the work registered as "PAU-3-375-443" is a roughly four-minute clip where Slate was filmed by someone else sitting in the back seat of the car Slate was driving.  Siegel MTD Decl. Ex. J.

Yet at his deposition Slate insisted that everything "in his copyrights" was recorded by him.  Dkt. 37-2 at 158:17-20; 159:3-8 (Slate Dep.).  His explanation to the Court for this clip was that he "set up a camera in the backseat of a car which filmed himself as well as the road in front of him."  Dkt. 71 at 19.  This again is incredulous.  The clip shows the picture moving to the floor (1:28); back up to Slate (2:03) zooming in on Baird in the other front seat (2:30), swinging around ninety and then 180 degrees to both sides of the car and back (3:53-57); (4:08-4:17), and Mark O'Flahavan can be heard from the back seat saying "I was recording as well" immediately before the camera is shut off (4:19).  Siegel MTD Decl. Ex. J.  Slate could have just said he made a mistake, but by presenting such stories he has not only misled the Court, he has called into question the validity of some or all of his copyright registrations.

The preceding examples are merely illustrative, because there are numerous other examples of Slate's misrepresentations during the course of litigation in this case, including:

• As a basis for demanding and even seeking to compel plenary discovery into a different 20/20 story that has nothing to do with this case, Slate asserted that "Defendant's employees repeatedly referenced their 'Police Tactics' episode [a wholly unrelated ABC News story] as evidence to support their assertion that Defendants, as a matter of policy, did not work with outsiders and would not use his footage if he gave them access to it." Dkt. 72-1 at 4.  There was not a shred of evidence of any such "reference" or "assertion" or "policy" in any documents or testimony, and all the evidence shows that ABC News often works with outside organizations. Dkt. 76 at 5-6; Dkt. 93-25 Ex. S-6 at 130:12-131:22 (Ruppel Dep.).

•      On March 27, ABC's counsel personally took a picture of the boarded-up row house where Slate tried to set a deposition so that the Court would know what the place looked like, and explained that in a Declaration filed two days later.  Dkt. 39-2 ¶ 3; *see also* Dkt. 39-4. Slate in response claimed that Defendants used "dated photographs of Plaintiff's house, taken years before he even owned it" to "wrongly discredit and malign him." Dkt. 40 at 2 – an obviously false claim given that he knows what his house looks like.

•      Slate has submitted backdated, false certificates of service to make it appear that certain documents were timely and properly served.  For example, on June 20, after discovery had closed, Slate e-mailed supposed "supplemental" interrogatory responses to Defendants' counsel, with the message: "Please find attached hereto a courtesy copy of documents transmitted to your office last week." Dkt. 93-23 Ex. S-3.  The actual responses included a Certificate of Service showing service by mail, dated June 17, 2011. *Id.* Ex. S-2.  Defendants' counsel never received these responses by mail, or by any other means other than that e-mail. Dkt. 93-22 at ¶ 4.

## III.    FRAUDULENT COLLECTION OF EVIDENCE

As a law student, the evidence suggests that Slate recently used his access to law school computers to engage in fraudulent communications directly with ABC employees to try to generate evidence in this case.

On May 12, the evening before an ABC Rule 30(b)(6) designee was to be deposed about licensing practices, Slate suddenly produced what appeared to be literally a photograph (in ".jpg" format) taken of the screen of a computer showing a portion of an e-mail from an ABC employee involved in licensing  certain forms of news footage.  The e-mail referred to "hidden camera footage" in a "segment" and saying "we do not own the copyright."  Dkt. 66-45.  The picture

Slate produced (which indicates it was created immediately before the e-mail was sent) removes all of the information explaining the e-mail's context, including the header showing the recipient, the e-mail's date and the e-mail to which it was responding.  *Id.*  A few weeks earlier, on April 22, without explaining why, Slate had demanded that Defendants produce any e-mails about this segment from a long list of employees at ABC News Video Source, the licensing office in which this employee works.  Dkt. 66-80.

Upon further investigation after Slate produced the screenshot picture, ABC recovered the fuller chain of e-mails and it became clear what Slate had done.  On April 21, 2011 Slate, using his own name and e-mail address, registered online for an account with ABC News Video Source, which licenses certain kinds of ABC News material.  At 10:14 a.m. on April 21, an employee there, Celina DeNicola, sent him a routine e-mail to him welcoming him to his account.  Dkt. 73-4.  A couple of hours later, a "JKJ" from the email address "jonathanjohnson@umd.edu – the name of Slate's brother (Dkt. 37-2 at 22:7-15 (Slate Dep.)) -- sent Ms. DeNicola an e-mail claiming to want to license "all the hidden camera footage" appearing in the entire 20/20 segment at issue, purportedly for use  "in the classroom," "in a local broadcast," or "nationally via a broadcast or information campaign," and asked how footage would be valued for each use.  Siegel MTD Decl. Ex. K.  The content of the phony e-mail, combined with a university address, thus made it appear that this was an inquiry from a professor or student.  The photograph of a computer screen Slate produced was the response to that e-mail. Dkt. 66-45.[7]

---

[7]The employee's response was accurate.  The entire 15-minute news segment contained about ten minutes of hidden camera footage of multiple forms, such as surveillance and security footage from various locations.  Other than the couple of minutes of footage filmed with the PCC, all was obtained from public record and other sources, so ABC News does not own it.  Dkt. 93-25 Ex. S-6 at 36:15-38:15 (Ruppel Dep.).

Even more bizarrely, Slate appears to want to use these emails, but has consistently denied that he has any access to this chain of correspondence – presumably because he recognizes that it does not look so good if his hands are directly linked to them.  So as soon as these e-mails were exchanged, he started demanding that *ABC* search its e-mails from ABC News Video Source (without explaining why), hoping that ABC would find and produce them. Even more absurd, Slate maintained to the Court that he cannot produce them because all he has is the screenshot "copy of an email *given to* Plaintiff" and it "was neither sent nor received by him or at any email address belonging to him or under his control, in native format.  Plaintiff has produced the only part of the document which he possesses to Defendants and cannot produce it in native format."  Dkt. 71 at 13 (emphasis added).  The obvious import of Slate's response – that the e-mails are only in his brother's control, not his own – makes a mockery of the Federal Rules of Civil Procedure.  Yet even after the Court granted ABC's motion to compel him to produce these emails, *see* 6/8/11 Minute Order, Slate to this day has ignored the order.

Of course, there can be little doubt that Slate's hands are all over these e-mails.  The outgoing IP address for the "Jonathan Johnson" e-mail is assigned to the University of the District of Columbia, where Slate attends law school and whose facilities he once tried to use for a deposition in this case.  Dkt. 37-2 at 18:1-19:16 (Slate Dep.); Dkt. 40-1 at ¶ 2; Siegel MTD Decl. at ¶¶ 23-24; *id.* Ex. L.  The Internet header data further shows a read receipt then went to the University of Maryland.  *Id.* at ¶ 23, 25 & Ex. M.  Plainly, Slate contrived a scheme where he first registered with ABC News Video Source, then he (or his brother at his direction) sent out this e-mail from a computer and e-mail account that is not Slate's to pose as an interested customer, and has ever since claimed that he does not have the e-mails.  That Slate appears to be

using law school facilities to perpetrate fraudulent litigation schemes, and his belief that the Federal Rules of Civil Procedure tolerates such chicanery, speaks for itself.

## IV.    WITNESS AND DEFENSE COUNSEL INTIMIDATION

For more than a year, Slate has systematically abused every aspect of the judicial process, from misusing the subpoena power to threatening and instituting civil and criminal charges, for the primary purpose of intimidating non-party witnesses, ABC employees, and even defense counsel.  This is a classic abuse of process and poses a direct threat to the integrity of this Court's proceedings.  This strategy has also affected other courts and law enforcement authorities in this region, and the record makes clear that such conduct is not limited to this case.

### A.    ABC Witnesses

Slate began deposition discovery in this case by sending Rule 30(b)(6) notices for depositions to  be taken at a boarded-up row house, in an obvious effort to discomfit and intimidate designees.  Dkts. 24-3, 24-4, 24-5; *see also* Dkt. 39-1 at 2.  Slate has since consistently used the discovery process to impose the maximum amount of inconvenience on ABC witnesses.  When Slate unilaterally noticed a deposition for a date when the intended designee, Glenn Ruppel, was going to have surgery, Slate refused to change the date.  *See generally* Dkt. 29-1.  Slate also later "produced" a bizarre series of photos of Ruppel and others that appear to be have been downloaded from the Internet, with no conceivable relevance to this case other than to intimidate Ruppel.  Dkt. 56-5.  Slate also identified more than a dozen ABC employees that he said he intended to depose and for months repeatedly demanded deposition dates for them.  Dkt. 24-6 ( "Please advise if you will accept service of deposition subpoenas on behalf of the following [23] individuals before open of business tomorrow morning otherwise I will proceed with personal service."); *see also* Dkts. 29-28; 62-5, 69-12 (5/3 at 2:25 pm; 5/4 at

1:30 pm).  Yet when Defendants' counsel provided dates for at least a half-dozen witnesses,

Dkt. 62-7, Slate never tried to take the deposition of a single fact witness apart from ABC News

20/20 anchor Elizabeth Vargas.

As for Vargas, Slate's effort to depose her was his most obvious bad-faith use of the

subpoena power solely to harass a prominent journalist.  Vargas had nothing to do with any of

the issues in this case; indeed the only discovery Slate otherwise pursued with regard to Vargas

was to use part of the Rule 30(b)(6) deposition ostensibly covering policies and procedures for

freelancers (which Vargas obviously is not) to ask the witness repeated questions about how

much money Vargas makes.  *See. e.g.*, Dkt. 62-11 at 31:13-14 ("Did you negotiate Elizabeth

Vargas's talent agreement?"); *id.* at 32:17-18 ("What is Elizabeth Vargas' job title"?); *id.* at

33:21-22 ("And how much does ABC News pay Elizabeth Vargas?").

Slate unilaterally subpoenaed her for a deposition set for May 26, which he served the

morning after Slate and defendants' counsel had conferred and agreed that date would be set

aside for the deposition of Rebekah Cowing in Chicago.  Dkt. 62-1.  Defendants informed him

that Vargas was unavailable, but offered an alternative date to hold the deposition while a

protective order was litigated.  Dkt. 62-10.  Slate refused to change the date, and refused again

after Defendants' filed both a motion for a protective order in this Court and a motion to quash in

New York.  Instead, he repeatedly threatened to move to hold Vargas in contempt.  Dkts. 69-5,

69-27.  Yet after all that, he filed no opposition to either motion.

### B.  <u>Non-Party Witnesses</u>

Even worse than his behavior against ABC witnesses has been Slate's systematic effort to

intimidate non-party witnesses, and most especially to try to neutralize Kamau and others

associated with the PCC as likely witnesses.  Slate has grossly abused the subpoena power and

instituted multiple civil and criminal charges against Kamau and others which, irrespective of

their merit, are all timed to interfere with their appearances as witnesses here and which Slate has

then tried to use to affect their ability to act as witnesses.  As part of this strategy, Slate has

systematically misrepresented facts relevant to this case to D.C. courts and both federal and state

law enforcement authorities.[8]  Specifically, Slate has proceeded as follows:

Though Slate and Kamau have been at war with each other since the end of 2007, he first

sued Kamau on August 7, 2009 in D.C. Superior Court, six weeks before instituting this action.

Dkt. 29-15.  The result was that mutual restraining orders were issued against *both* Slate and

Kamau.  Dkts. 29-3 at 18:10-19:2, 29-17.  Just a month later, on September 16, 2009, Slate filed

this lawsuit.  Dkt. 1.  Though the timing of the two filings are troubling, while Slate was

represented by counsel he did not institute any other proceedings against any person related to

the PCC.  Then on July 19, 2010, Slate's counsel moved to withdraw, stating that "continued

representation under the circumstances has been rendered impossible," a conclusion "confirmed

by legal ethics counsel of the District of Columbia Bar and the Virginia State Bar."  Dkt. 13 at 1.

Slate's strategy quickly changed.

The ABC Case is Stayed – Slate Sues and Seeks Criminal Charge Against Multiple PCC Persons

As his counsel was withdrawing and this case was stayed, Slate quickly filed or initiated

no fewer than four additional civil and criminal proceedings against three PCC-related persons in

just four months:

---

[8] Since Slate and the PCC split at the end of 2007, the degree of acrimony between Kamau. Kamau's wife Tyra Ferrel, and Slate has been extraordinary.  Shortly after he split with the PCC, Slate began sending Ruppel years-old court cases, bizarre audio recordings, and other materials to impugn Kamau, Dkt. 93-12 Ex. R72, and Kamau alleges that Slate has engaged in various internet campaigns to malign him.  Dkt. 93-36 Ex. S-123.  In turn, Kamau and Ferrel have conducted their own internet campaign against Slate.  Despite multiple lawsuits no court to date has actually passed judgment on the merits of their disputes, though at least one judge expressed concern about the conduct of both sides. Dkt. 29-16 at 48:8-12; Dkt. 29-20 at 16:16-22.  Regardless, Slate's disputes with Kamau provide no justification for engaging in systematic abuse of process and witness intimidation to influence this case.

1.      On July 26, 2010, Slate moved to hold Kamau in contempt for allegedly violating the restraining order issued the previous year.  Dkt. 69-23.

2.      A month later, Slate urged D.C. police to initiate criminal contempt charges against Kamau for the same alleged contempt, which apparently resulted in a bench warrant for Kamau's arrest in the District of Columbia in or around August 25, 2010.  Dkt. 69-20.  Slate obtained the warrant in part by misleading a detective about this case.  Slate told the officer that Kamau had sent him a threatening e-mail (which Kamau denies), and claimed:

> The June 9, 2010 message was posted and relayed to me by Mr. Kamau a few hours before I was scheduled to give testimony in a matter pending before Judge Emmet Sullivan in federal court.  The timing of the message and its references to my impending testimony were clearly intended to and had the effect of intimidating me in my capacity as a witness in that case.

*Id*.  In fact, there was no deposition scheduled on June 9 – the parties had ostensibly reached a settlement two weeks earlier and had cancelled that deposition.  Dkt. 69-22.  In reality, as subsequent events have shown,  Slate's real purpose for seeking the warrant was to complicate Kamau's ability to appear for a deposition or trial in the District of Columbia in this case, as well as to try to discredit him in these proceedings.

3.      On October 1, 2010, Slate called 911 and claimed that a private investigator hired by Kamau had assaulted him, and then asserted that the alleged assailant had yelled "drop that fucking lawsuit against ABC," an allegation he has repeated multiple times in this case and even implied that ABC was somehow involved.  *See generally* Dkt. 69 at 16-18.  The investigator, Greg Miller, was arrested at the scene solely on Slate's word, and the charge was later dismissed by prosecutors.  *Id.*  Tellingly, a videotape that Slate took only *after* D.C. police officers had responded to his call (not of any alleged assault) demonstrates that Slate lied to the arresting officer to help procure that arrest, by telling her that he had no connection to the PCC and  that Miller was trying to intimidate him because the PCC "took" his film and "sold it"

to ABC.  Dkt. 61-9 at M2U00003, 1:24-1:37, 5:30- 5:56, 8:14.  This incident is discussed in more detail at Dkt. 69 at 16-18.

4.     On November 23, 2010, Slate filed a lawsuit against Tyra Rasmus, Kamau's wife, again in D.C. Superior Court, by filing a claim for a Civil Protection Order that automatically entitled him to free counsel.  That lawsuit was initially settled via a no-admission consent order, though it appears that may now be contested.  Dkt. 69-24.

Slate Renews this Case Pro-Se

After he began litigating this action *pro se* in January 2011, Slate quickly proceeded to lay the groundwork for using these collateral actions to attempt to discredit and intimidate witnesses here.  On February 2 and 3, 2011 Slate sent Defendants' counsel several bizarre e-mails saying that a warrant existed for Kamau's arrest, that D.C. police were demanding that no information about this warrant be publicly disclosed, and that Defendants' counsel would be guilty of obstruction of justice if they disclosed the existence of the warrant on the public record.[9]  Notably, this was shortly after the motion for civil contempt that Slate had filed against Kamau on essentially the same issue was denied by the D.C. Superior Court on January 14, 2011.  Dkt. 29-20 at 16.  The day after he sent these e-mails, on February 4, 2011, Slate issued *five* different subpoenas to Kamau from this case – including one for his personal tax records. He also subpoenaed two of Kamau's prior employers for personnel records dating back to the

---

[9] Dkt. 64-3 ("I am talking about the criminal warrant for your witness Diop Kamau (AKA DONALD CARLOS JACKSON) issued by Judge Abrecht of the DC Superior Court on August 28, 2010.  I have advised you that a detective with the Metropolitan Police Department has expressed to me that if any information, beyond that which is public, concerning this warrant is relayed to Mr. Kamau it will impede law enforcement's ability to serve the warrant."); *id.* (2/3 at 2:46: "I have specifically requested, based on an explicit request from the Metropolitan Police Department Detective, that Kamau not be given any information concerning the warrant until the detective is able to locate and serve him. Do you agree not to disclose details of the warrant to your fugitive witness Kamau?").

1980s.  In addition, Slate issued subpoenas to two other non-party witnesses ABC had identified, and their employer, for their personnel and tax records.  Dkt.29-1 at 8-9; Dkt. 29-26.

Kamau's Deposition – Slate's Efforts to Use Criminal Proceedings to Neutralize Kamau

On May 3, 2011, Defendants' counsel e-mailed Slate that they were going to take Kamau's deposition, and at that point Slate sprung into high gear.  Dkt. 69-26.  On May 9, Slate filed a motion in D.C. Superior Court to hold Kamau's wife in criminal contempt for allegedly violating their settlement agreement.  Dkt. 69-24.  That motion is still pending.

Moreover, now that Kamau was actually about to become a likely witness the supposed need for secrecy about his arrest warrant suddenly disappeared.  Dkt. 58-4.  On May 10, Slate filed a motion to depose Kamau in D.C. on the same date his deposition in Florida had been noticed by Defendants, on the grounds that there is an outstanding bench warrant for him here, and moved a week later to halt the Florida deposition on the same grounds.  Dkt. 58.  Both motions were plainly frivolous, but their obvious, indeed express purpose, was to try to stack the deck so that if he did appear at his deposition Slate could have him arrested.   Siegel MTD Decl. Ex. N (Slate: "Your claim that he now lives in Florida is only made in an effort to take his deposition while allowing him to remain at-large as a fugitive and continue to avoid service of the warrant for his arrest.").

The Kamau Deposition

When Kamau's deposition nonetheless went forward in Florida on June 9-10, Slate began his side of the examination by bringing a process server to the deposition to serve a document subpoena on Kamau for this case.  Dkt. 93-24 at 251:12-252:6 (Kamau Dep.).[10]  This was actually the second non-party deposition in this case in which Slate engaged in this intimidation

---

[10] More recently, Slate falsely asserted to this Court that this subpoena was served on May 25, to make it appear it was materially in advance of the deposition.  Dkt. 89 at 3.

exercise.[11]  In addition, Kamau's deposition became the occasion for yet more service of process,

when the sheriff arrived for him to accept service on behalf of his wife process for Slate's

pending contempt motion against her in D.C. Superior Court.  *Id.* at 375.  Shortly thereafter, as

part of his examination Slate sprang the bench warrant on Kamau (who quite obviously was not

aware of it) and then examined him about his status as a supposed "fugitive."  *Id*. at 399:20-

404:21; *see also id*. at 402:16-19 ("Do you know if you have a warrant for issued by Judge

Albrecht of the D.C. Superior Court, Warrant Number 2010CRW002297 for criminal contempt

of court in Washington, D.C.?").  Slate also used his examination to probe for other potential

areas of criminal liability (Kamau was not represented at the deposition), such as questions about

Kamau's personal income taxes.  *Id*. at 276:7-16.[12]

       After the deposition was over, Slate then asked ABC to consent to an amendment to the

protective order in this case so that he could provide a video recording of the Kamau deposition

to law enforcement agencies allegedly investigating Kamau:

> Given that the United States Attorney's Office is currently conducting a criminal
> investigation of Mr. Diop Kamau (Also Known As Donald Carlos Jackson), the
> District of Columbia Bar Association is currently investigating allegations raised
> by Mr. Diop Kamau (Also Known As Donald Carlos Jackson) in complaints
> against several local attorneys, and Mr. Diop Kamau (Also Known As Donald
> Carlos Jackson) addressed several relevant issues concerning these ongoing
> investigations during his deposition I believe there are compelling reasons to ask
> the court to narrowly revise its protective order concerning Mr. Diop Kamau's
> (Also Known As Donald Carlos Jackson) deposition.
>
> Therefore, Plaintiff is likely to ask the Court to revise its Protective Order to
> allow the United State's Attorney's Office and the District of Columbia Bar
> Association to view and retain copies of Mr. Diop Kamau's (Also Known As

---

[11] At the deposition of Rebekah Cowing, Slate also began his examination by serving the witness
with a document subpoena, in that instance ostensibly returnable just four hours later.  Dkt. 93-27 Ex. S-
10 at 39:4-40:12 (Cowing Dep.).

[12] The animus between the two at the deposition was palpable; Kamau even brought a coffee mug
containing a police mug shot of Slate's mother.  However, once again their disputes provide no excuse for
Slate to manipulate judicial process and proceedings to try to influence the outcome of *this* case.

Donald Carlos Jackson) video taped deposition for the purposes of their ongoing investigations.

Siegel MTD Decl. Ex. O.  After ABC's counsel ignored him, Slate filed the entire videotape of the Kamau deposition on the public record of this matter as an exhibit to motion papers, even though the videotape had nothing to do with the underlying (discovery extension) issue that was the subject of the motion.  Dkt. 81-4.

### C.     Defendants' Counsel

All attorneys are used to a certain amount of saber-rattling from some opposing litigants, and even counsel, including some whose propriety may stretch ethical boundary lines.  Slate's conduct, however, has leapfrogged beyond them and is yet another systematic effort to engage in harassing behavior, replete with threats to institute fabricated civil and/or criminal charges and bar complaints, all intended to deter ABC counsel from zealously representing their clients.

Slate's tactics have taken two forms.  One is a series of rather juvenile attempts to try to discomfit defense counsel or even implicitly threaten more serious harm.  Many of these tactics have been previously described in this case – producing documents that smelled like excrement when the box was opened, Dkts. 29-2 at ¶ 21, 29-33 at ¶ 2; improperly video-recording defense counsel at a deposition, Dkt. 37 at 3; noticing depositions for a boarded-up row house, Dkt. 39-1 at 2; and even offering to meet defense counsel at counsel's personal residence after midnight. Siegel MTD Decl. Ex. P.  Among the most bizarre has been Slate's frequent efforts to lure defense counsel to locations to ostensibly produce and/or review documents that are either unidentified or identified only by an address– like supposed "document storage facilities" in Baltimore and Washington, D.C., or "2479 Frederick Avenue" – which upon further examination are places like abandoned houses or closed storefronts.  Dkt. 66-1 at 26-27.

More disturbing, however, have been Slate's repeated fabrication of allegations to support threats to sue and/or seek criminal process against ABC's counsel.  The Court may recall that at the end of the first status conference in this matter, Slate claimed that Defendants were somehow involved in recordings of him that violated Illinois recording laws, which he followed up with a letter to Defendants' counsel threatening criminal and/or civil charges against them if such recordings were ever used.  Dkt. 69-25.  Slate never identified what recordings he was talking about, and there are none – to the contrary, Slate has produced multiple recordings of calls to and from Illinois.  Slate has made many similar threats.  *See also* Dkt. 64-3 (2/2 at 1:43 p.m.:"There is significant evidence that prior disclosures by your office to Mr. Kamau have resulted in threats and acts of bodily harm against me . . . "); *id.* (2/3 at 4:32 p.m.: "If your office relays information concerning this warrant to Mr. Kamau you will be aiding in his continued avoidance of its service and his obstruction of justice in this matter.  Please govern yourselves accordingly.); Dkt. 69-18  ("I have received information that Mr. Bowman has misrepresented himself during contracts with witness in this case and attempted to intimidate them.  I will be bringing this matter to the courts attention.").

Ultimately, this culminated in a fabricated claim of assault by ABC's counsel, replete with the implication that ABC and its counsel sanctioned assaults by others.  Dkt. 69 at 15-16.  Slate then threatened to use proceedings in this case to serve counsel with personal process.  Dkt. 69-28 (5/11: "Do you have personal counsel, Mr. Siegel?") (5/20: "Do you have personal counsel who will accept service on your behalf?  If not, will you be at the deposition on Tuesday?").  *See also* Siegel MTD Decl. Ex. Q ("Your conduct in assaulting me, your repeated misrepresentations to the court and your facilitation Mr. Kamau's obstruction of justice, not the

least of which was revealing the date of my deposition so he could threaten me before it, will no doubt bring amount [sic] inquiry from the bar association.").

Moreover, it is clear that this kind of conduct is not unique to this case, reinforcing why it is important for this Court to grant this motion.  Less than two months ago, a Baltimore court issued an unusual restraining order against Slate, effective for six months, for harassing a young attorney who is his opposing counsel in a pending foreclosure action involving one of his properties there.  *Id.* Ex. R at 3.  The record of Slate's conduct there looks similar to what he has done here:  sending her multiple e-mails threatening to sue her personally and to file bar complaints and alleging that she directed her client to perpetrate torts and criminal assaults, *id.* at 19 (accusing her agents of having "shouted obscenities, destroyed personal property, damaged real property, made threats, and assaulted a young boy."), 21 ("I will be in the case after I file my bar complaint and counter-claim against you and your client"), and (especially disturbing to her) attempting to lure her to unexplained, creepy locations and contacting her personal Facebook account.  Her petition for a restraining order recounted that Slate called her and told her he would only accept service of process if she met him personally, giving her an address that was her home address, leading her to fear for her safety.  *Id.* at 17.  Slate then called again and gave her the same address, but in another city – which turned out to be a barren parking lot (the street address coinciding with her home obviously having been picked to let her know he knew where she lived), reminiscent of his efforts here to stage meetings in such locations.  *Id.*[13]

---

[13] Her petition further states that these actions arose out of a dispute over whether she could serve him at "1832 West Fayette Street" in Baltimore.  Slate claimed to her that he lives in the District of Columbia, and he even threatened to bring an action against her client in this Court, based on diversity jurisdiction.  *Id.* at 19, 22.  Yet Slate testified under oath in this case a few months earlier that he lives at 1832 W. Fayette Street.  Dkt. 37-2 at 28:10-13, 32:15-20, 33:16-34:8 (Slate Dep.).

V.      **ABUSING THE DISCOVERY PROCESS**

Finally, Slate has otherwise systematically misused the discovery process.  As previously discussed he has produced thousands of pages and hours of videotape of wholly irrelevant materials, generated solely for the purpose of wasting defendants' resources and, in some cases, hiding other documents inserted in them.  *See, e.g.*, Dkt. 39-1; Dkt. 66-2 at ¶ 6.  To note one more example, prior to being compelled to produce all footage filmed in Chicago, Slate's tape production consisted primarily of producing entirely blank VHS tapes, along with eight hours of programs recorded in the early 1990s on Philadelphia television stations when Slate would have been about eight years old – mostly episodes of "The Simpsons," along with former  President Bush (the first) commenting on the imminent outbreak of Operation Desert Storm in 1991.  *Id.* at ¶ 4.  Such tactics are the essence of bad-faith.

This stands in stark contrast to the absence of genuinely relevant evidence produced by Slate. As previously noted, apart from the Letter and notes, Slate's production contains no e-mails or any analogous documentary communications with ABC and the PCC during the time period most directly relevant to this lawsuit.  By contrast, Slate has produced hundreds of pages of documents and recordings seeking to impugn Kamau and the PCC, including even such items as PCC client checks and bank account deposits, but typically before or after the most relevant time period.  Siegel MTD Decl., Ex. S (representative examples).  This evidentiary gap simply does not add up.  Indeed, the handful of e-mails that Slate has produced virtually all come from the e-mail account gslate@gregslate.com.  *See* Siegel MTD Decl. Exs. V, W.  Google's records indicate that Slate opened that account on February 23, 2008, just a week before he registered his "copyrights."  Siegel MTD Decl. Ex. T at GOOGLE 03.  The earliest e-mail he has produced with anyone was sent just a few hours after that account was opened.  Siegel MTD Decl. Ex U.

It makes little sense that Slate all of a sudden started retaining e-mails as of February 23, 2008, and only from that account, but had nothing at all relevant to this litigation for the two years preceding.  Indeed, Slate has produced virtually no e-mails from his personal University of Maryland e-mail address, apart from one or two that likewise post-date his purported "withdraw of license."  Yet Slate used that account for years and ABC has produced multiple e-mails communicating with him at that account.  They include even a couple from after February 23, 2008 which Slate likewise has not produced, even though he appears to have either forwarded them or responded to them from his Google account.  Dkt. 93-12 Ex. R75, R67, R68. Defendants will never really know what Slate may have withheld, and fortunately there is a large amount of evidence produced by ABC and provide more than sufficient evidence to fill in the gap and warrant summary judgment.  Nonetheless, the combination in this case of fabricated evidence and the absence of genuine evidence is striking.

Finally, Slate has completely abused the obligation imposed by Local Rule 7(m) to meet and confer regarding the filing of discovery motions.  This took several forms.  First, Slate has repeatedly falsely represented his availability to avoid conferring about issues raised by Defendants, while always demanding instant availability to confer about his own numerous demands.  This often reached the absurd.  For example, on January 17 Slate cancelled a meet and confer intended to address an issue that was ripe the next day, and claimed he was only available 3-4 days hence and only at two specific times.  Siegel MTD Decl. Ex. X; *see also* Dkt. 24-1 at ¶ 4.  Yet nine minutes later, Slate sent a detailed letter by e-mail claiming to be available all day for each of the next nine days to have his deposition taken, which he obviously wanted to do immediately because had not yet produced any documents.  Siegel MTD Decl. Ex. Y.  Then when a couple of days later Defendants' counsel accepted one of his proposed meet and confer

times, Slate was suddenly not available for the next eight days.  *Id.* Ex. Z.  This pattern repeated

itself for months.  *E.g.*, Dkt. 66-1 at 36-37.  By contrast, when Slate had issues to discuss, he

routinely demanded instant availability, including on nights and weekends.[14]

More disturbingly, Slate routinely has fabricated supposed discussions that never

occurred at all, as well as the results of discussion that did occur.  *See, e.g.*, Siegel MTD Decl.

Ex. BB.  As a result, Rule 7(m) conferences were of no value at all.  The scheduling of Rebecca

Cowing's deposition is a good example.  At Slate's request the parties conferred and agreed to

move her deposition from May 25 and hold May 26, purportedly because the former was

inconvenient for Slate to travel.  The next day, Slate unilaterally subpoenaed Elizabeth Vargas

for that date – which prompted Defendants' counsel to give up trying to confer about scheduling

depositions.  And the scheduling of the Rule 30(b)(6) deposition, for which the Court had

ordered the parties to confer "in good faith," was instead an especially absurd exercise in bad-

faith manipulation.  Dkt. 69 at 14-15, n.8.

## ARGUMENT

It is well-settled that district courts may dismiss an entire action with prejudice under

both the Federal Rules of Civil Procedure *and* under the court's inherent power for "abusive

litigation practices undertake in bad faith." *Young v. U.S. Sergeant at Arms*, 217 F.R.D. 61, 65

---

[14] *See, e.g.*, Siegel MTD Decl. Ex. AA (2/2 at 1:43 p.m.: "I am available anytime today after 3:15 p.m.") (2/3 at 2:30 p.m.: 'I am available to talk right now if you want.') (Sunday 2/6 at 2:57 p.m.: "I am available to talk to you any time today.") (3/2 at 8:15 a.m., then again at 9:41 a.m.: "Are either of you available to confer by phone concerning Plaintiff's motion to compel interrogatories today at 10:30 am?') (3/4 at 7:46 a.m. : "If I have not heard from your office concerning the status of defendants response by 9:30 am I file a motion to compel your responses.") (3/8 at 10:46 a.m.: "Please be advised that if your office has not responded by 2:30 pm today with a time we can confer today I will file my motion to compel and note your refusal to confer. I am available to confer by phone any time today.") (4/5 at 4:58 p.m.: "I am available to meet and confer in the next hour") (5/2 at 4:19 p.m.: "Alternatively, reply immediately with a time we can confer by phone today or tomorrow.") (5/25 at 4:12 p.m.: "Are you available for a 7(m) conference at 5 pm?") (6/15 at 10:41 a.m.: "Are you available to 7(m) confer by phone at 12 pm concerning this motion?").

(D.D.C. 2003); *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511 (6th Cir. 2002) ("the inherent authority of the Court is an independent basis for sanctioning bad faith conduct in litigation."); *Bowers v. Nat'l Collegiate Athletic Ass'n*,  564 F. Supp. 2d 322, 333 (D.N.J.,2008) (district courts "are empowered to dismiss cases in which a party or its attorney has engaged in serious litigation misconduct") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)); *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 n.10 (3d Cir. 1995) (district court "may dismiss a suit outright in response to litigation abuses"). As one district court succinctly summarized the doctrine:

> [t]he inherent power [to dismiss a case] arises from the very nature of the judicial institution, and is incidental and necessary to the fair and efficient operation of the courts. Thus, the power of the courts to impose silence, decorum, and respect, and to require submission to rules of fair play is "universally acknowledged to be vested in courts" so as to "achieve the orderly and expeditious disposition of cases."

*Derzack v. County of Allegheny*, 173 F.R.D. 400, 411 (W.D. Pa. 1996), *aff'd without op.*, 118 F.3d 1575 (3d Cir. 1997) (citations omitted).

"An explicit warning that dismissal may occur if a party continues with litigation misconduct is not always necessary."  *Sanai v. Sanai*, No. C02-2165Z, 2005 WL 1593488, at *9 (W.D. Wash. July 1, 2005) (citing *Malone v. U.S. Postal Service*, 833 F.2d 128, 133 (9th Cir. 1987)), *aff'd*, 141 F. App'x 677 (9th Cir. 2005) (unpublished); *see also Fharmacy Records v. Nassar*, 248 F.R.D. 507, 530 (E.D. Mich. 2008) ("A party does not need formal notice to know that spoliation of evidence and misrepresentations may lead to dismissal."), *aff'd*, 379 F..App'x. 522 (6th Cir. 2010).  Moreover, a sanction of dismissal can be applied to bad faith litigation conduct regardless of whether a litigant is proceeding *pro se* – a conclusion all the more warranted here where Slate is a law student.  *E.g.*, *Vaughn v. Brigham*, No. 3:10-05, 2011 U.S. Dist. LEXIS 72187, at *14 (E.D. Ky.) (pro se plaintiff's case dismissed for perjury and

fabrication of evidence where "conduct [was] not the result of inartful pleading or any lack of

legal training," rather, plaintiff had "shown himself to be quite knowledgeable of applicable

statues and rules of procedure," and his conduct was the result of a "bad faith attempt . . . to

deceive the Court"), *reconsideration denied*, 2011 U.S. Dist. LEXIS 77250 (E.D. Ky. July 15,

2011)).

      In this Circuit, there are three basic justifications for dismissing a case because of

litigation misconduct: (1) "the other party has been so prejudiced by the misconduct that it would

be unfair to require [the party] to proceed further in the case," (2) the party's "misconduct has

put an intolerable burden on [the court] by requiring the court to modify its own docket and

operations in order to accommodate the delay," *or* (3) the court finds it necessary "to sanction

conduct that is disrespectful to the court and to deter similar misconduct in the future." *Webb v.

Dist. of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (internal quotation marks and citations

omitted). Furthermore, "[a] sanction imposed pursuant to any of these considerations must be

based on findings supported by the record" and the Court must "explain its reason for issuing a

default judgment rather than a lesser sanction." *Id.*

      The severity of Slate's conduct compels a sanction of a dismissal with prejudice on

especially both the first and third grounds, though we also believe the docket reflects this case

has put far more burden on the Court than should be warranted. In order to implement his

strategy of altering reality to support his infringement claim, it is clear that Slate has fabricated

key evidence, repeatedly perjured himself and presented knowingly false facts in numerous

discovery motions to this Court as well as to other courts, engaged in fraudulent tactics, engaged

in gross witness intimidation tactics, abused the subpoena power, falsely threatened and accused

opposing counsel of various criminal and tortious activity, and has otherwise misused the Federal

Rules of Civil Procedure and the local rules and process of this Court.  Moreover, the evidence is

clear that such tactics are essentially Slate's *modus operandi*.  Lesser sanctions are therefore

unlikely to be effective, and dismissal of this case is especially warranted to sanction "conduct

that is disrespectful to the court and to deter similar misconduct in the future."  *Id.* (internal

quotation marks and citations omitted).

Moreover, Slate's conduct has caused enormous prejudice to Defendants, transforming

what should be a relatively simple case into one in which Defendants have expended substantial

amount of resources on matters such as conducting discovery in Chicago on the history of a local

Emmy award, subpoenaing witnesses and documents to address matters such as the authenticity

of e-mails, reconstructing basic facts of Slate's life that he has sought to erase, sifting through

large quantities of deliberately worthless discovery, scouring records to try to reconstruct the

details of numerous specific expenditures for plane flights, hotels, rental cars etc. there should be

no question he took, and filing protective orders to avoid depositions in bizarre locations and

inspect documents in places other than parking lots.  It would be unfair to require Defendants to

proceed any further in this matter.

Courts have emphasized that "[t]he exercise of inherent authority is particularly

appropriate for impermissible conduct that adversely impacts the entire litigation."  *First Bank of

Marietta*, 307 F.3d at 516.  That is clearly the case here, because the vast majority of Slate's

conduct cannot be adequately addressed by provisions of the Federal Rules.  For example, Rule

11 would not readily apply because the conduct goes far beyond the accuracy of specific

pleadings in the complaint, and even that would be a more complicated issue because until July

18, 2011 the only operative complaint was signed by attorneys who withdrew.  Similarly, the

sanction of Rule 37(b)(2) is limited to violations of discovery orders.  As the Supreme Court has

held in language that applies directly to the facts of this case:

> Much of the bad-faith conduct by Chambers, however, was beyond the reach of
> the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith
> and an attempt to perpetrate a fraud on the court, and the conduct sanctionable
> under the Rules was intertwined within conduct that only the inherent power
> could address. In circumstances such as these in which all of a litigant's conduct
> is deemed sanctionable, requiring a court first to apply Rules and statutes
> containing sanctioning provisions to discrete occurrences before invoking
> inherent power to address remaining instances of sanctionable conduct would
> serve only to foster extensive and needless satellite litigation, which is contrary to
> the aim of the Rules themselves.

*Chambers*, 501 U.S. at 50-51.

Indeed, the type of conduct at issue here has prompted numerous courts to dismiss cases

under their inherent power.  For example, "[d]ismissal is particularly appropriate where a

plaintiff seeks to enhance the merits of her case with fabricated evidence and fictionalized

testimony."  *Young*, 217 F.R.D. at 70.  In these situations, "'monetary sanctions may be

inherently inadequate to remedy the harm to the public interest in preserving the integrity of the

courts and in deterring future misconduct.'"  *Id*. (quoting *Derzack*, 173 F.R.D. at 417).  *See also*

*Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas LLC*, 516 F.3d 623, 626-27

(7th Cir. 2008) (affirming dismissal as a sanction for perjury and other litigation misconduct);

*Pope v. Fed. Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992) ("The dismissal of Pope's suit

was based on the district court's finding that manufactured evidence and perjured testimony had

been introduced in an attempt to enhance the case through fraudulent conduct."); *REP MCR*

*Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 1003 (N.D. Ill. 2005) (third party complaint

dismissed where party "was often combative, offered inconsistent testimony, or could not answer

questions on cross-examination in a meaningful manner at all"), *aff'd*, 200 F. App'x 592 (7th

Cir. 2006) (unpublished); *Vargas v. Peltz*, 901 F. Supp. 1572, 1580-81 (S.D. Fla. 1995)

(dismissing suit as sanction for plaintiff's fabrication of evidence and presentation of false testimony to support claims).  That is especially so where the misconduct is focused on the key evidence or witnesses in the case, as it is here. [15]

In *Fharmacy Records v. Nassar*, 248 F.R.D. 507 (E.D. Mich. 2008), another copyright infringement action, the defendants simultaneously filed two dispositive motions:  a motion for summary judgment on the infringement claim and a motion to dismiss for bad-faith litigation under the court's inherent powers.  The district court granted both motions.[16]  Defendants respectfully submit that case provides an appropriate roadmap for this one.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' motion to dismiss should be granted.

---

[15] *See, e.g., Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (case dismissed where plaintiff fabricated key document and gave it to his attorney); *McDowell v. Seaboard Farms of Athens, Inc.*, No. 95-609-CIV-ORL-19, 1996 WL 684140, at *8 (M.D. Fla. 1996) (case dismissed where plaintiff fabricated evidence that would have been the "linchpin" of his case, and perjured himself in deposition and hearing testimony); *Eppes v. Snowden*, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986) (counterclaim stricken as a result of party committing fraud on the court by submitting "backdated" letters); *Breakwater Trading, LLC v. Maslin*, No. 06 C 4242, 2008 WL 619329, at *1-2 (N.D. Ill. Mar. 3, 2008) (case dismissed where plaintiff fabricated evidence, committed perjury and "put a false face on vital facts"); *REP MCR Realty, LLC v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005) (same).  *See also Bull v. UPS, Inc.*, No. 07-CV-02291, 2010 WL 4553551, at *2 (D.N.J. Oct. 29, 2010) (dismissal appropriate where "[c]ommon sense and reasonableness in light of this record, and the numerous and repeated references to the fact that Plaintiff never accounted for the absence of the originals, point to nothing less than purposeful withholding of critical evidence").

[16] On appeal, the Sixth Circuit affirmed the dismissal sanction and therefore found it unnecessary to reach the merits of the summary judgment ruling.  *Fharmacy Records v. Nassar*, 379 F.. App'x 522 (6th Cir. 2010).  In addition, after the dispositive motions were granted, the defendants moved in the district court for attorneys fees and costs, both under the court's inherent power and as the "prevailing party" under the Copyright Act, pursuant to 17 U.S.C. § 505, which the district court granted.  *Fharmacy Records v. Nassar*, 572 F. Supp. 2d 869, 880-82 (E.D. Mich. 2008).  Defendants  reserve their right to seek fees on either or both grounds at the appropriate juncture, depending on the Court's disposition of these motions.  *See also* Fed. R. Civ. P. 54(d)(2).

Dated:  September 2, 2011

Respectfully submitted,

By:      /s/ Chad R. Bowman
         Nathan E. Siegel, (D.C. Bar No. 446253)
         Chad R. Bowman, (D.C. Bar No. 484150)

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, N.W., Suite 800
Washington, D.C.  20036-5514
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
E-mail: nsiegel@lskslaw.com
E-mail: cbowman@lskslaw.com

*Counsel for Defendants*